O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| VALTER SILVA PAIVA, | ) | Case No. CV 15-05018 DDP (ASx) |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING DEFENDANTS' MOTION** |
| | ) | **TO DISMISS** |
| v. | ) | |
| | ) | [Dkt. No. 13] |
| SUSAN CURDA, in her capacity | ) | |
| as District Director of the | ) | |
| Los Angeles District of the | ) | |
| U.S.C.I.S. and LEON | ) | |
| RODRIGUEZ, in his capacity | ) | |
| as Director of the | ) | |
| U.S.C.I.S., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Presently before the Court is Defendants' Motion to Dismiss
for Failure to State a Claim under Federal Rule of Civil Procedure
12(b)(6).  (Dkt. No. 13.)  After considering the parties'
submissions and hearing oral argument, the Court adopts the
following Order.

**I.    BACKGROUND**

This immigration case involves a petition by Plaintiff Valter
Silva Paiva for the district court to review the United States
Citizenship and Immigration Services's ("USCIS") denial of

1  Plaintiff's naturalization application.  (Compl., dkt. no. 1.)

2      Plaintiff is a citizen of Brazil and a lawful permanent

3  resident ("LPR") of the United States.  (Id. at Ex. 1.)  Plaintiff

4  received his LPR status on September 25, 2008, based on Plaintiff's

5  marriage to a natural-born U.S. citizen, Rachael Paiva, in January

6  2008.  (Id.)  Initially, Plaintiff's LPR status was conditional,

7  which means it was subject to review after two years.  (Id. at Ex.

8  5.)  Plaintiff's LPR conditions were lifted on September 20, 2010.

9  (Id.)

10      After three years of marriage to the same U.S. citizen and

11  three years of LPR status, Plaintiff applied for U.S. citizenship

12  naturalization by filing his N-400, which the USCIS received July

13  6, 2011.  (See id. at Exs. 1 (N-400), 5 (USCIS decision).)  On

14  October 25, 2011, Plaintiff was interviewed by USCIS.  (Id. at Ex.

15  2.)  Plaintiff passed the English and U.S. history and government

16  tests, but he was required to provide more information to USCIS.

17  (Id. at Exs. 2, 3.)  Plaintiff inquired about the status of his

18  application and updated his address on November 22, 2011, and

19  February 2, 2012.  (Id. at Ex. 4.)

20      On April 18, 2013, USCIS sent Plaintiff its naturalization

21  decision.  (Id. at Ex. 5.)  USCIS determined Plaintiff was not

22  eligible for naturalization.  (Id.)  USCIS found that Plaintiff and

23  his wife had not been living in marital union for the requisite

24  time period based on Immigration Services Officers conducting site

25  visits and investigations.  (Id.)  The officers determined that

26  Plaintiff had been living with the mother of his two children from

27  May 9, 2010, to February 21, 2012, at a different residence than

28  where his wife resided.  (Id.)  Then, Plaintiff appeared to move to

1  a different address.  (_Id._)  Neither of these two addresses were

2  listed on Plaintiff's N-400 form.  (_Id._; Ex. 1.)  USCIS found these

3  facts inconsistent with Plaintiff's N-400 and his interview.  (_Id._)

4  USCIS also raised other issues relating to Plaintiff not listing

5  his children on prior immigration forms as well as providing false

6  testimony to obtain an immigration benefit based on Plaintiff's

7  residency issues, thus barring Plaintiff from naturalization.

8  (_Id._)

9       Plaintiff filed an administrative appeal of this denial.  (_Id._

10  at Ex. 6 (N-336 form).)  Plaintiff requested a hearing to explain

11  his N-400 form and his marital circumstances.  (_Id._)  Plaintiff

12  explained that his marriage to Rachael is "legitimate" and that

13  "the reason we currently live a[t] separate household[s] has to do

14  with her change in personal preference."  (_Id._)  Plaintiff said

15  that he moved out of the Cherry Avenue address that he shared with

16  his wife and mother-in-law in May 2010 "because my wife told me

17  'she prefer to have relationship [with] girls.'"  (_Id._)  Plaintiff

18  said he had "no place to go while I'm still trying to resolve the

19  issue with my wife," so he rented an apartment with the biological

20  mother of his children at a Garford Avenue address.  (_Id._)

21  Plaintiff says he still sees his wife "regularly at work" and that

22  they are "still trying to resolve [their] marital differences."

23  (_Id._)  The two bought a condo together at Redondo Avenue in May

24  2011, but Plaintiff's wife issued a quitclaim deed of the property

25  to Plaintiff for credit reasons.  (_Id._)

26       Plaintiff wanted his children to live with him in the condo,

27  but he claims the biological mother of the children rejected the

28  change in custody without her moving to the condo as well.  (_Id._)

3

1   Plaintiff got his wife's permission to allow his children and their
2   mother to live in the condo while Plaintiff found a different place
3   to live at a Seaside Way address, then at an El Prado Avenue
4   address.  (Id.)  Plaintiff says he stays in contact with the
5   biological mother of his children because of his fatherly
6   obligations and "to provide support." (Id.)  Plaintiff was granted
7   an appeal hearing on March 5, 2014, for his naturalization denial.
8   (Id. at Ex. 7.)

9        On April 14, 2015, USCIS issued its decision reaffirming its
10  denial of Plaintiff's naturalization application.  (Id. at 8.)  In
11  this decision, USCIS stated that Plaintiff failed to qualify for
12  naturalization because he must first have LPR status.  (Id.)  USCIS
13  found that when Plaintiff filed to remove the conditions from his
14  LPR status, he was not living in marital union; thus, Plaintiff
15  provided false information to get an immigration benefit.  (Id.)
16  USCIS therefore found that Plaintiff had not *lawfully* been admitted
17  as a permanent resident prior to applying for naturalization.
18  (Id.)

19       After the second denial, Plaintiff filed this petition for
20  review.  (Compl., dkt. no. 1.)  Now, the Government has filed a
21  motion to dismiss the complaint for failure to state a claim.
22  (Mot. Dismiss, Dkt. No. 13.)  The Government argues that Plaintiff
23  is not eligible for naturalization because he was not in marital
24  union with his wife for the three years prior to applying for
25  naturalization.  (Id. at 2.)  Plaintiff argues that he did not live
26  in the same house as his wife, but they were legitimately married —
27  any informal separation requires the Court to make a de novo review
28  after a full hearing.  (Opp'n at 2.)

4

## II.   LEGAL STANDARD

A 12(b)(6) motion to dismiss requires a court to determine the sufficiency of the plaintiff's complaint and whether it contains a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Under Rule 12(b)(6), a court must (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-pled factual allegations as true, as well as all reasonable inferences to be drawn from them.  See Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001), amended on denial of reh'q, 275 F.3d 1187 (9th Cir. 2001); Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998).

In order to survive a 12(b)(6) motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  Dismissal is proper if the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008); see also Twombly, 550 U.S. at 561–63.

A complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

1  defendant is liable for the misconduct alleged." Id.  The Court

2  need not accept as true "legal conclusions merely because they are

3  cast in the form of factual allegations." Warren v. Fox Family

4  Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003).

5      Federal district courts review de novo agency denials of

6  naturalization applications for U.S. citizenship.  8 U.S.C. §

7  1421(c).  The court "shall make its own findings of fact and

8  conclusions of law and shall, at the request of the petitioner,

9  conduct a hearing de novo on the application." Id.  "[T]he

10 district court has the final word and does not defer to any of the

11 [agency's] findings or conclusions." United States v. Hovsepian,

12 359 F.3d 1144, 1162 (9th Cir. 2004) (emphasis omitted).

13 **III. DISCUSSION**

14     The Government Defendants seek for this Court to dismiss

15 Plaintiff's petition because they argue the facts presented by

16 Plaintiff do not satisfy the legal prerequisites for

17 naturalization.  (Mot. Dismiss at 2.)  Specifically, the Government

18 contends that in the forms Plaintiff attached to his complaint,

19 Plaintiff admitted he did not live in the same residence as his

20 wife when he filed his application for naturalization.  (Id.)  This

21 admission, the Government argues, prevents Plaintiff from

22 naturalizing because the statute requires Plaintiff to actually

23 live in the same residence — under the same roof — as his spouse in

24 order to fulfill the statutory requirement of three years of

25 marital union.  (Id. at 8-9.)

26     Plaintiff argues that he was living in marital union as the

27 statute requires when he applied for naturalization.  (Opp'n at 4-

28 5.)  Plaintiff relies on In re Olan, 257 F. Supp. 884 (S.D. Cal.

1966), to argue that the statute's "marital union" requirement can be satisfied by spouses who are still legitimately married although not physically living together. (Opp'n at 5.) Thus, while Plaintiff and his wife did not live physically together, they continued to live in marital union because they were still legitimately married; they "continued to work on their marriage and had no intentions of permanently separating nor took any steps to execute a divorce." (Id. at 6.) Plaintiff claims he left his belongings at the Cherry Avenue residence with his wife and "always had the intention of returning to reside with his wife after they had solved their marital issues." (Id. at 7.)

Plaintiff also argues that to the extent that he was separated from his wife, it was an "informal separation" that "must be evaluated on a case-by-case basis" to determine if the separation actually signifies the end of the marital union. (Id.) This is a factual question that cannot be decided on a motion to dismiss, Plaintiff claims. (Id.) Lastly, Plaintiff explains that the USCIS finding that Plaintiff had given false testimony to gain an immigration benefit, thus preventing him from naturalizing, was based on the erroneous view that Plaintiff was not living in marital union with his wife. (Id. at 7-8.) Whether Plaintiff gave false testimony is also a question of fact because it requires a determination of Plaintiff's subjective intent, he argues; thus, this is not appropriate for determination on the pleadings. (Id. at 8.)

The Government responds that Plaintiff's reliance on In re Olan is inapposite because the case dealt with a previous version of the agency's regulations interpreting the statutory requirement.

1  (Reply at 3.)  Now, the Government argues, there are new regulatory

2  sections that interpret the statute and they are entitled to

3  Chevron deference.  (Id. at 4.)  The Government claims that these

4  new regulations result in a material difference in the outcome in

5  this case from that in In re Olan.  (Id.)

6      Further, the Government claims that the regulatory language

7  that Plaintiff relies on for his informal separation argument is

8  inapplicable here.  (Id. at 5-6.)  The Government relies on its

9  USCIS policy manual explaining how the agency interprets its

10 regulation, which the Government argues is entitled to deference

11 because the interpretation is "neither plainly erroneous nor

12 inconsistent with the regulation."  (Id. at 6.)  The policy states

13 that the informal separation analysis only applies to married

14 persons who are still living together in the same residence.  (Id.)

15 Therefore, the Government claims, based on Plaintiff's own

16 admissions, he does not qualify as living in marital union or as

17 informally separated, and so the Court should grant the Motion to

18 Dismiss.  (Id. at 6-7.)

19     **A.   Statutory and Regulatory Framework**

20     Plaintiff has brought his application for naturalization as a

21 LPR who has been married to a U.S. citizen for at least three

22 years.  (Compl., Ex. 1.)  There are several statutory prerequisites

23 Plaintiff must meet to be eligible for such an application.

24 Relevant here, 8 U.S.C. § 1430(a) requires Plaintiff to show that

25 "during the three years immediately preceding the date of filing

26 his application [he] has been living in marital union with the

27 citizen spouse."  Congress has not further defined what "living in

28 marital union" means in this context.

1    The agency entrusted with implementing the immigration laws,

2    currently the Department of Homeland Security of which USCIS is a

3    part, has issued regulations regarding this statutory requirement.

4    The most important here, 8 C.F.R. § 319.1, is entitled, "Persons

5    living in marital union with United States citizen spouse," and it

6    explains the eligibility requirements under section 319(a) of the

7    Immigration and Nationality Act, 8 U.S.C. § 1430(a).  The same

8    three year "living in marital union" requirement is repeated in 8

9    C.F.R. § 319.1(a)(3).  Under subsection (b) of the regulation,

10   there are two main subparts, "(1) General" and "(2) Loss of Marital

11   Union," and these two subparts provide specific definitions for the

12   "living in marital union" requirement:

13        (b) Marital union —

14             (1) General.  An applicant lives in marital union with
                a citizen spouse if the applicant actually resides
15             with his or her current spouse.  The burden is on the
                applicant to establish, in each individual case, that
16             a particular marital union satisfies the requirements
                of this part.
17
                (2) Loss of Marital Union —
18
                     (i) Divorce, death or expatriation. . . .
19
                     (ii) Separation —
20
                          (A) Legal separation.  Any legal separation
21                        will break the continuity of the marital
                          union required for purposes of this part.
22
                          (B) Informal separation.  Any informal
23                        separation that suggests the possibility of
                          marital disunity will be evaluated on a
24                        case-by-case basis to determine whether it
                          is sufficient enough to signify the
25                        dissolution of the marital union.

26                        (C) Involuntary separation.  In the event
                          that the applicant and spouse live apart
27                        because of circumstances beyond their
                          control, such as military service . . . or
28                        essential business or occupational demands,

1
2
3
> rather than because of voluntary legal or
> informal separation, the resulting
> separation, even if prolonged, will not
> preclude naturalization under this part.

4  8 C.F.R. § 319.1(b).

5  **B.   _Chevron_ Deference**

6      When an agency promulgates regulations interpreting and

7  enacting statutes that the agency is entrusted to administer and

8  execute, such regulations are entitled to _Chevron_ deference under

9  _Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,_

10  467 U.S. 837, 844-45 (1984).  The application of _Chevron_ deference

11  involves two questions, or steps.  First, the court asks "whether

12  Congress has directly spoken to the precise question at issue"; if

13  so, the analysis ends there because Congress's action or

14  interpretation would control.  _Id._ at 842-43.  If not, then the

15  second step "is whether the agency's answer is based on a

16  permissible construction of the statute."  _Id._ at 843.  "If

17  Congress has explicitly left a gap for the agency to fill, there is

18  an express delegation of authority to the agency to elucidate a

19  specific provision of the statute by regulation.  Such legislative

20  regulations are given controlling weight unless they are arbitrary,

21  capricious, or manifestly contrary to the statute."  _Id._ at 843-44.

22  If the delegation is less than explicit, then "a court may not

23  substitute its own construction of a statutory provision for a

24  reasonable interpretation made by the administrator of an agency."

25  _Id._ at 844.

26      The Court finds, consistent with all the other courts to have

27  examined the issue as cited by the Government, that the agency's

28  regulation at 8 C.F.R. § 319.1 is entitled to _Chevron_ deference.

1  Congress has not directly spoken on the definition of "living in

2  marital union" from its statute, 8 U.S.C. § 1430(a).  Thus, the

3  second step of <u>Chevron</u> comes into action here, and the Court finds

4  that the agency's answer — its interpretation of "living in marital

5  union" as provided in 8 C.F.R. § 319.1 — is based on a permissible

6  and reasonable construction of the statute.

7  **C.   <u>In re Olan</u> and Regulatory Amendments**

8  Plaintiff relies heavily on <u>In re Olan</u> to argue that the

9  agency's regulation does not require him to live under the same

10 roof as his citizen spouse in order to be "living in marital

11 union."  The district court in <u>In re Olan</u>, examining the pre-1991

12 language of the agency's regulation, held that "'living in marital

13 union' means simply living in the status of a valid marriage."  <u>In

14 re Olan</u>, 257 F. Supp. at 890.  The court continued, explaining the

15 policy of protecting families as supporting its holding:

16      Surely, preservation of the family unit should be our
        touchstone in construing the phrase 'in marital union.'
17      And just as surely our inquiry should begin and end with a
        valid marriage, entered into and begun in good faith, and
18      still continuing and in existence as a legal status.

19 <u>Id.</u> at 891.  The court postulated that any deeper inquiry into

20 marital relations would be "utterly insufferable" and

21 inappropriate.  <u>Id.</u>  The court noted that families are individual,

22 and marital discord does not necessarily spell the end of marital

23 union, even where physical separation is a part of the situation:

24      Suppose a marital spat between alien wife and citizen
        spouse.  The husband takes his sports gear and goes fishing
25      for two or three or four months in Canada or New Zealand;
        or skiing in Europe; or just loafing and painting in
26      Tahiti.  Does this mean neither husband nor wife is 'living
        in marital union?'  Or the wife takes the baby and enough
27      gear for a two or three month stay and packs self and baby
        off to mother?  Again, can it be said that the 'living in
28      marital union' has ended?

        Obviously not.  The status continues; marriage continues;
        the marital union continues; all rights, all duties, all
        obligations, all responsibilities of the marital union
        continue.  They do not die, they cannot end — the marital
        union itself does not die and it cannot end — until there
        has been an end to the status by death or by judgment and
        decree of court, which in California is and must be a final
        decree of divorce.

<u>Id.</u>  Therefore, the court found in that case that the plaintiff was

still living in martial union with her husband despite her husband

moving physically out of the home for several months before the

plaintiff filed her application for naturalization and as they

remained physically separated during her application process.  <u>Id.</u>

at 888, 891.

        However, <u>In re Olan</u> was decided before the 1991 amendments to

the agency's regulation interpreting "living in marital union."

<u>See</u> 56 Fed. Reg. 50,475, 50,488 (Oct. 7, 1991), 1991 WL 198206

("1991 amendment").  The Government argues that the 1991 addition

of subsection (b) to 8 C.F.R. § 319.1 clarifies that what the court

in <u>In re Olan</u> was afraid of — the invasion into the married life of

an applicant — is required by the statute because more than just a

valid marriage is required for marital union.  (<u>See</u> Reply at 3-4.)

        The Government argues that this amended regulation is entitled

to <u>Chevron</u> deference "because it interprets the statutory 'marital

union' requirement in a way that effectuates congressional intent."

(<u>Id.</u> at 4.)  The Government's theory is that because Congress did

not explicitly state that "marital union" means "a mere valid

marriage," that instead "requiring spouse[s] to actually share a

residence better fulfills congressional intent."  (<u>Id.</u>)  The

Government claims that to hold otherwise would be to encourage

1  "sham marriages."  (Id. citing Petition for Bashan, 530 F. Supp.

2  115, 120 (S.D.N.Y. 1982).)

3       The Court agrees that Chevron deference is owed to the

4  agency's regulations, including the amendments in 1991.  But the

5  same policy concerns that animated the court in In re Olan are

6  still relevant to the analysis of the statute and amended

7  regulation today.

8       **D.   Interpretation of the Regulation**

9       Based on the Court's research, the Ninth Circuit has not yet

10 interpreted or discussed the language "living in marital union"

11 from the regulation.  However, as the Government notes, there are

12 several cases from other Circuits and from district courts across

13 the nation that have undertaken such interpretation.  (Mot. Dismiss

14 at 9 (collecting cases).)

15      The Government argues that the weight of authority supports

16 its position that "living in marital union" from 8 U.S.C. § 1430

17 and 8 C.F.R. § 319.1 "can be satisfied only by an applicant who

18 resides under the same roof as his or her citizen spouse."  (Mot.

19 Dismiss at 8.)  The Government understands 8 C.F.R. § 319.1(b)(1)'s

20 language,

21      An applicant lives in marital union with a citizen spouse
        if the applicant actually resides with his or her current
22      spouse.

23 to mean that the spouses must literally live under the same roof in

24 order to live in marital union.  (Mot. Dismiss at 8-9.)

25      Looking at the regulation's plain meaning and structure, there

26 are two equal subsections to "(b) Marital Union": there is

27 subsection "(1) General" and subsection "(2) Loss of Marital

28 Union."  8 C.F.R. § 319.1(b).  The language of the regulation in

(b)(1)'s "General" requirement states that living in marital union means "the applicant *actually resides* with his or her current spouse." Id. § 319.1(b)(1) (emphasis added). The Court notes that the language of the regulation is "actually resides," not "same roof." However, the usual meaning of "residence" is where individuals live. For example, Black's Law Dictionary defines "residence" as "[t]he act or fact of living in a given place for some time . . . [t]he place where one actually lives, as distinguished from a domicile." Residence, Black's Law Dictionary (10th Ed. 2014). An ordinary dictionary definition provides that a "residence" is "the place, especially the house, in which a person lives or resides; dwelling place; home." Residence, The Random House College Dictionary 1123 (Rev. Ed. 1980). Thus, the regulation in subsection (b)(1) provides for living in marital union where spouses reside and live together in the same place. Put another way, the Court sees subsection (b)(1) to provide the traditional, usual situation of living in marital union, where spouses are living together under the same roof. If the spouses are validly married and live together under the same roof, no further questions need be asked; this would end the analysis under the regulation.

However, as Plaintiff noted in his Opposition, there is another part to subsection (b) of 8 C.F.R. § 319.1 besides subpart (1). The second subpart, (b)(2), provides definitions for situations where there is a loss of marital union, including where a spouse dies or expatriates, or when a divorce occurs. In those three situations, the regulation states that "the marital union ceases to exist due to death or divorce, or the citizen spouse has

expatriated." 8 C.F.R. § 319.1(b)(2)(i). Subpart (b)(2) also explains what happens when there is a separation in the marriage. Unlike the case with death, divorce, and expatriation, there is not one simple answer to situations where spouses are separated, and the regulation draws distinctions between three different separations: legal, informal, and involuntary. 8 C.F.R. § 319.1(b)(2)(ii)(A)-(C).

Subpart (b)(2)(ii)(B) provides agency guidance for what "marital union" means in the context of an "informal separation," and Plaintiff argues that this subpart applies to his situation. (See Opp'n at 7.) The Government's position is that this subpart of the regulation does not apply to Plaintiff because "USCIS has interpreted it to apply only in cases of informal separation where the spouses continue to live in the same household." (Reply at 5.)

**E.   Agency Policy**

In arguing that the informal separation section of the regulation does not apply to Plaintiff's situation, the Government relies on a USCIS policy manual's interpretation of the regulation on informal separation, which states:

> In many instances, spouses will separate without obtaining a judicial order altering the marital relationship or formalizing the separation. **An applicant who is no longer actually residing with his or her U.S. citizen spouse following an informal separation is not living in marital union with the U.S. citizen spouse.**
>
> **However, if the U.S. citizen spouse and the applicant continue to reside in the same household, an officer must determine on a case-by-case basis** whether an informal separation before the filing of the naturalization application renders an applicant ineligible for naturalization as the spouse of a U.S. citizen. Under these circumstances, an applicant is not living in marital union with a U.S. citizen spouse during any period of time in which the spouses are informally separated if such separation suggests the possibility of marital disunity.

1   12 USCIS Policy Manual pt. G, ch. 2(A)(1), <u>available at</u> www.uscis
2   .gov/policymanual/HTML/PolicyManual-Volume12-PartG-Chapter2.html
3   (emphasis added).

4        In making the case-by-case analysis, the USCIS policy requires
5   officers to consider factors such as the length of separation, the
6   continued support of the family, the spouses' intentions, and
7   whether the spouses became involved with other individuals in
8   relationships.  <u>Id.</u>  This policy interpretation supports, the
9   Government contends, the fact that informal separations still
10  require the spouses to actually live together, and again the
11  Government means under the same roof.  (Reply at 6.)

12       The Government argues that the USCIS policy manual's
13  interpretation of the regulatory language is entitled to judicial
14  deference, citing <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410,
15  414 (1945).  The Government raises <u>Seminole Rock</u> deference in its
16  Reply brief, stating that the Court "should defer to USCIS's
17  limitation of Section 319.1(b)(2)(ii)(B) as applying only where the
18  parties still reside together" because "USCIS's understanding of
19  its own regulation is neither plainly erroneous nor inconsistent
20  with the regulation."  (Reply at 6 (citing <u>Seminole Rock</u>, 325 U.S.
21  at 414).)  The Government contends that under the policy manual's
22  interpretation, section 319.1(b)(1) "screens for spouses who do not
23  reside together" and (b)(2)(ii)(B) "acts as a more discerning tool
24  that USCIS can use to detect marital disunion when spouses have
25  informally separated but still reside together."  (Reply at 6.)
26  The Government maintains that such an interpretation of the two
27  regulatory sections "synthesizes and gives effect to both
28  regulatory provisions."  (<u>Id.</u>)

1    <u>Seminole Rock</u> provides for judicial deference to agency
2    interpretation of *ambiguous* regulations.  The case states, "[s]ince
3    this involves an interpretation of an administrative regulation a
4    court must necessarily look to the administrative construction of
5    the regulation *if the meaning of the words used is in doubt*."  325
6    U.S. at 413-14 (emphasis added).  In such an instance, the agency's
7    interpretation of its own regulation is used "unless it is plainly
8    erroneous or inconsistent with the regulation."  <u>Id.</u> at 414; <u>see</u>
9    <u>also</u> <u>Auer v. Robbins</u>, 519 U.S. 452, 461 (1997).

10   <u>Chevron</u> deference is owed to regulations interpreting statutes
11   because, in part, of the notice and comment rulemaking process and
12   other procedural safeguards.  However, such processes are absent
13   when agencies make policies, which is why there is a different
14   rationale for deference.  <u>Seminole Rock</u> and the subsequent cases
15   applying its rule[1] are for situations where an agency's regulation
16   has ambiguous language or application.  <u>See</u> <u>Christensen v. Harris</u>
17   <u>Cnty.</u>, 529 U.S. 576, 588 (2000) ("But <u>Auer</u> deference is warranted
18   only when the language of the regulation is ambiguous.")  When a
19   regulation is ambiguous, it makes sense to have some level of
20   deference to the agency that promulgated it.  However, where the
21   regulation is not ambiguous and it was properly adopted through
22   notice and comment rulemaking procedures, changing the meaning of
23   the regulation by adding an interpretive "gloss" on the regulation
24   is not entitled to judicial deference.  Nor should it be, as such a

25   _____

26   [1]    The Court notes recent Supreme Court cases calling into
question but not overruling the <u>Seminole Rock</u> rule.  <u>See, e.g.</u>,
27   <u>Perez v. Mortg. Bankers Ass'n</u>, 135 S. Ct. 1199, 1210-25 (2015)
(Alito, J., concurring in part and in the judgment) (Scalia, J.,
28   concurring in the judgment); <u>Christopher v. SmithKline Beecham</u>
<u>Corp.</u>, 132 S. Ct. 2156, 2168-69 (2012).

1  gloss did not have the same procedural safeguards as did the

2  unambiguous regulation at their respective creations.

3       Here, the Court finds that the agency's regulation at 8 C.F.R.

4  § 319.1(b) is unambiguous and <u>Seminole Rock</u> deference does not

5  apply to the agency's policy manual purporting to interpret the

6  regulation further.  The plain meaning of the regulation and its

7  structure also contradict the proposed construction in the USCIS

8  policy manual, so even under <u>Seminole Rock</u> the policy would be

9  entitled to less weight because the policy is inconsistent with the

10 regulation's plain language.

11      Examining the regulatory language, subpart (b)(2)(ii) has

12 three parts dealing with different kinds of separation.  The "(B)

13 Informal separation" part states that "***[a]ny*** informal separation

14 that ***suggests*** the possibility of marital disunity ***will be evaluated***

15 on a case-by-case basis to determine whether it is sufficient

16 enough to signify the dissolution of the marital union."  8 C.F.R.

17 § 319.1(b)(2)(ii)(B) (emphasis added).  The language is clear — *any*

18 informal separation, not only informal separations where the

19 parties remain living in the same place.  Further, the regulation

20 plainly deals with situations which may *suggest* the possibility of

21 marital disunity.  Situations that are likely to suggest marital

22 disunity often involve some kind of change in residence, whether it

23 be from the bedroom to the couch or from the house to a hotel.

24      Further, the language of residence is not present in two out

25 of the three separation scenarios, but it is mentioned in "(C)

26 Involuntary separation."  There, the regulation states: "In the

27 event that the applicant and spouse ***live apart because of***

28 ***circumstances beyond their control*** . . . ***rather than because of***

18

1   ***voluntary legal or informal separation***, the resulting separation,

2   even if prolonged, will not preclude naturalization under this

3   part." 8 C.F.R. § 319.1(b)(2)(ii)(C) (emphasis added).  This

4   language also plainly points out that there are situations where

5   voluntary legal or informal separations will involve spouses living

6   apart.  In the legal separation scenario, the controlling fact is

7   that the spouses have taken a legal step to formalize marital

8   disunity and they are, for all intents and purposes, essentially

9   divorced in the eyes of the law; this is why the regulation states

10  that spouses who take this step are not living in marital unity.

11  See id. § 319.1(b)(2)(ii)(A).  In the informal separation scenario,

12  however, the regulation accounts for the more messy situation by

13  requiring a case-by-case analysis, regardless of where the spouses

14  are actually living.

15      USCIS could have phrased its regulation to include language of

16  residence in (b)(2), as it did in (b)(1), or it could have had

17  residence be the test for "living in marital union," full stop —

18  but it did not, as it included further tests and explanation in

19  (b)(2) for the loss of marital union.  The agency, through notice

20  and comment rulemaking, could amend the regulation to reflect its

21  desire for a rule requiring actual residence in one household for

22  informally separated couples.

23      But such an understanding cannot be held against Plaintiff in

24  this case because that is not the law evident on the face of the

25  agency's unambiguous regulation.  The agency's proposed

26  interpretation is not apparent from the plain language of the

27  regulation.  The policy seeks instead to add language to an

28  otherwise unambiguous regulatory section.  Such an interpretation

would conflate two separate and equally weighted subparts of subsection (b) defining living in marital union. The Court finds that such an interpretation is not warranted because of the unambiguous statutory language and because to adopt such a policy would be inconsistent with the plain language of the statute.[2]

Thus, the Court is left with a regulation entitled to <u>Chevron</u> deference that provides two equally weighted subsections defining "marital union" — one section provides the "general" situation of spouses living together, the other section provides for how marital union can be lost, such as when spouses do not live together. A case-by-case analysis is required for informal separations because in that situation, the spouses may not live together in the same residence, but they also have not changed the legal status of their marriage.

Marriage is a complicated but ultimately rewarding and crucially important part of life that, when preserved, even if just

---

[2]   The Court also notes that the agency's policy interpretation appears to lead to untenable results:

A couple who has lived together under the same roof for three years applies for the noncitizen spouse to naturalize. One night, sometime before the interview for naturalization, the spouses have a terrible fight; they informally separate, and the alien spouse leaves the household and spends the night alone in a hotel. Thereafter, the spouses resume residence under the same roof.

At the naturalization interview, the alien spouse is asked if the couple has lived in marital union — actually resided together — for the three years prior to applying and since applying. Would the alien spouse be lying if he or she responded no? What if the stay at the hotel was for a week, a month, a year? What if it preceded the application to naturalize?

Under the plain language of the USCIS policy, it appears that the one night of nonresidence — meaning not under the same roof — could be fatal to this application. The policy does not include any indication of a minimum time that the spouses have to not share the same roof to restart the clock on marital unity, or even just fully end marital union. That is an untenable result logically, and not called for based on the plain language of the regulation.

barely, should be entitled to at least the respect of an individualized determination of its continued vitality.  The Court respects the fact that USCIS seeks to prevent fraudulent marriages and the concomitant cheating of the naturalization scheme, but the Court also believes that the regulation as unambiguously adopted provides for ways to determine such fraudulent marriages through a case-by-case analysis of complicated situations.

The problem is that the proposed policy interpretation excludes legitimate but physically separated marriages while allowing fraudulent marriages where individuals with no intention of actually being married continue to live together under one roof, as would roommates.  But the regulation notes that real marriages — meaning nonfraudulent ones — may involve situations where the spouses do not live together, whether for informal separations with the intention to remain validly married while a fight or personal change is dealt with; or for involuntary separations where the couple is validly married but one spouse is deployed in the military or working abroad or across the state.

Absent Ninth Circuit or other controlling precedent holding otherwise, the Court declines to interpret the statutory and (unambiguous) regulatory provisions as requiring the Government's proposed "same roof" living arrangement for informal separations. Marital unions are as diverse as the people who make up the union, and there are surely many variations of sleeping and living arrangements that are appropriately considered "living in marital union."  The Court hesitates to draw "marital union" so narrowly that a marital spat resulting in some physical separation cannot be addressed as just that, and not the ending of a marriage —

1    particularly where the regulation providing for informal

2    separations does not require such a result.  The agency's

3    regulation does not require a contrary result.  Instead, a case-by-

4    case analysis is warranted in situations where an informal

5    separation has taken place, as the regulation provides.

6        **F.   Application to Plaintiff's Case**

7        Taking all well-pled facts as Plaintiff has alleged them, as

8    the Court must at the motion to dismiss stage, the Court finds that

9    Plaintiff has alleged sufficient facts to show he was living in

10   marital union with his wife and thus is potentially eligible for

11   naturalization.  Plaintiff alleges that he did move out of the

12   family residence at Cherry Avenue in May 2010 because of a change

13   in his wife's "personal preference," a highly intimate matter.

14   (Compl. at Ex. 6.)  However, according to Plaintiff, he sees his

15   wife regularly, they own property together, and they are trying to

16   resolve their marital differences.  (Id.)  The reason Plaintiff

17   lived with the mother of his two children is that he remains

18   supportive of them for his children's sake and had no other place

19   to go during his marital issues.  (Id.)  He asked his wife's

20   permission before moving the mother and his children into the condo

21   that Plaintiff owned with his wife.  (Id.)

22       All of this points to Plaintiff's intention to stay with his

23   wife in a legitimate marriage despite the current physical

24   separation, which has them living in the same city, although

25   sleeping at different homes.  More factual development will be

26   necessary to determine the merits of Plaintiff's claim, but at the

27   pleading stage, Plaintiff has sufficiently shown that he has stated

28

a claim because the facts as pled show an informal separation, not a clear end to the marital union.

**IV.    CONCLUSION**

Based on the reasons stated above, the Court DENIES Defendants' Motion to Dismiss.


IT IS SO ORDERED.


Dated: February 9, 2016

DEAN D. PREGERSON
United States District Judge